```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
                                   :
ANNE FAGGIONATO,                   :
                                   :
              Plaintiff,           :   06 Civ. 2614 (LAP)
                                   :
        -against-                  :   MEMORANDUM AND ORDER
                                   :
RANDOLPH D. LERNER,                :
                                   :
              Defendant.           :
                                   :
-----------------------------------x
```

LORETTA A. PRESKA, United States District Judge:

Plaintiff Anne Faggionato ("Faggionato") brought the above-captioned action seeking specific performance, damages including lost profit and/or sales commissions and damages for loss of reputation, and costs, of a supposed agreement by Defendant Randolph D. Lerner ("Lerner") to purchase a painting.  Lerner now moves to dismiss this action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  For the following reasons, the motion to dismiss for lack of standing is granted.

BACKGROUND

Faggionato is a citizen of the United Kingdom and a dealer in paintings. (Complaint, filed April 3, 2006 ("Compl.") ¶ 1.)  Lerner is a citizen of the United States and a resident of New York City. (Compl. ¶ 2.)  This lawsuit alleges the breach of a contract to purchase a painting of a haystack ("meule" in French) by the painter Claude Monet[1] (the "Painting") and seeks damages in the sum of $13 million, the alleged sales price of the Painting. (Compl. ¶ 5.)  Faggionato alleges that Lerner entered into a binding agreement to purchase the Painting, subject to receiving the customary documentation establishing its authenticity and provenance. (Compl. ¶ 5.)  Faggionato asserts that this documentation was supplied to Lerner on or about February 2, 2006, but that Lerner refused to consummate the purchase. (Compl. ¶ 5.)

Lerner maintained a relationship with an established New York art dealer Curt Marcus ("Marcus") and informed Marcus of his desire to purchase a Monet haystack. (Compl. ¶ 9.)  In May, 2005, Marcus sought Faggionato's help in locating such a painting. (Compl. ¶ 10.)  In November,

---

[1] The French Impressionist artist Claude Monet (1840-1926) produced a famous series of haystack paintings in the 1890s. (Compl. ¶ 6.)

2005, Faggionato informed Marcus that she had located an early Monet haystack, the Painting, which had not been included in the Wildenstein Institute's comprehensive catalogue of Monet's works. (Compl. ¶ 11.)  The Wildenstin Institute ("Wildenstein") is an expert on Monet paintings and the publisher of the comprehensive catalogue raisonné of Monet's paintings. (Compl. ¶ 12.)  A document issued by Wildenstein (often called an "attestation" or "certificate") attesting that a painting is or will be listed in the Wildenstein catalogue raisonné is evidence of a painting's authenticity. (Compl. ¶ 12.)

Between November 30, 2005, and January 10, 2006, Faggionato and Marcus exchanged a series of e-mails concerning the Painting, including Lerner's questions about the Painting. (Compl. ¶ 12.)  These questions concerned the authenticity of the Painting, its provenance, condition, ownership, and the reason for its absence from the Wildenstein catalogue raisonné. (Compl. ¶ 14, Declaration of Leonard S. Baum, Esq., dated June 30, 2007, ("Baum Decl."), Ex. B.)  On September 8, 2005, the Wildenstein Institute executed an attestation letter stating that the Painting would be included in an upcoming supplement to the catalogue raisonné. (Compl. ¶ 15, Baum Decl., Ex. A.)

On December 22, 2005, Marcus wrote to Faggionato, stating that Lerner sought a confirmed date to view the Painting. (Compl. ¶ 16, Baum Decl., Ex. C.)  On December 27, 2005, Marcus wrote to Faggionato, stating that Lerner "has already allocated the money for this purchase" and that "pending the viewing, confirmation of date, as well as condition, he will act fast . . . . His wife approves, his accountant completely approves, the money is sitting and waiting." (Compl. ¶ 17, Baum Decl., Ex. D.)

On January 4, 2006, Faggionato asked Marcus for a document from Lerner's lawyer or banker confirming Lerner's readiness to pay $13 million for the Painting. (Compl. ¶ 18.)  Also on January 4, 2006, Douglas C. Jacobs, an accountant for Lerner, executed a "letter of intent" stating that Lerner is, "prepared to purchase the Monet 'Meule' painting in the amount of US $13 Million, subject to his viewing and approval, and the receipt of customary documentation." (Compl. ¶ 18, Baum Decl., Ex. E at 3.)

On January 7, 2006, Marcus wrote to Faggionato stating that he had two questions: "1. Was the painting originally purchased from the artist or through a dealer?  2. Will my client receive a bill of sale from the owner?  Will we know the original owners [sic] identity?" (Compl. ¶ 21, Baum Decl., Ex. H at 1.)  Faggionato responded that the first

4

purchase would be "disclosed in 'Provenance' and can be checked in due course (through Wildenstein Institute)." (Compl. ¶ 21, Baum Decl., Ex. H at 2.)  However, as to the second question, Faggionato replied that Lerner would not receive a bill of sale from the owner, but would learn of his identity "in due course." (Compl. ¶ 21, Baum Decl., Ex. H at 2.)  Also on January 7, 2006, Marcus wrote to Faggionato expressing Lerner's concern "as to what recourse he would have, should he receive a letter one day from a collector in Paraguay stating that they are the actual owners . . . if he does not have a bill of sale from either the owners/seller or from a company that traditionally deals with this kind of transaction/money." (Compl. ¶ 22, Baum Decl., Ex. I at 1.)  Faggionato replied, "Fret not my friend[] the painting has been in the same family for the last 100 years, Art [L]oss Register ha[s] no record, I am working on the disclosure issue and the pigment analysis has already been done." (Compl. ¶ 22, Baum Decl., Ex. I at 3.)

Kendris Private is a prominent wealth management firm in Europe and a manager of Nouvelle Société Anonyme des Arts, the company with which Faggionato was working in implementing the sale. (Compl. ¶ 18.)  On January 8, 2006, Lerner's assistant, Kim Lazzara, wrote to Kendris Private

stating that she would wire a 10% refundable deposit on January 9, for the Painting that Lerner would be viewing in Paris on January 10. (Compl. ¶ 25.)  On January 8, 2006, Faggionato wrote to Marcus, "On [T]uesday [m]orning [January 10], I will produce 3 copies of a file containing: description of the painting[,] copy of the Certificate[,] copy of the Passport[,] copy of both condition reports[,] copy of the search result in the Art Loss Register[,] and and any other relevant documents." (Compl. ¶ 24, Baum Decl., Ex. J.)  Faggionato alleges that on January 9 or 10, she delivered copies of those documents, including the [Wildenstein] certificate, two condition reports, and search results from the Art Loss Register, but not the export license for the Painting (the "Passport.")[2] (Compl. ¶ 24.)  In her originally filed Complaint, Faggionato claims to have delivered the Art Loss Register report on January 9 or 10, but later notes in the annotated Complaint submitted in the Baum Declaration dated June 30, 2007, that "it appears that the Art Loss Register was issued January 17, 2006" but does not explain this inconsistency with the

---

[2] The "Passport" is an export license that must be issued by French government. (Compl. ¶ 47.)  Faggoinato claims the owner had initiated the process in December, 2005, and that it usually takes one to four months to obtain the requisite approvals from museum personnel and the government. (Id.) An official passport for the Painting was issued on January 27, 2006. (Id.)

allegation in the Complaint. (Compl. ¶ 24, Baum Decl.,
Annotated Complaint, filed June 30, 2007, ¶¶ 19, 24.)  On
January 9, 2006, Lerner's lawyer, Joseph DeCampo wrote to
Marcus describing the type of documentation De Campo wanted
but also noting that if Lerner liked the Painting, the
"next step would be to document the sale either in the form
of a sales contract or bill of sale which we assume would
be a direct contract between the sellers and our client,
individually.  It is this document that the seller will
make various representations and warranties." (Compl. ¶ 26,
Baum Decl., Ex. L.)

On January 10, 2006, Lerner inspected the Painting at
the offices of Art Transit in Paris. (Compl. ¶ 27.)  That
day, Lerner asked Faggionato for the Painting's provenance.
(Compl. ¶ 28.)  Faggionato replied that "she could not
guarantee that she could convince the owners to reveal
their identities on official documents." (Compl. ¶ 28.)
Faggionato claims that on January 10, 2006, at 5:00 pm,
Lerner orally announced to Faggionato and Marcus, "I have
made my decision.  I am buying the painting." (Compl.
¶ 29.)  Faggionato asserts that Lerner requested no payment
terms but stated that as soon as the paperwork was
finished, he would pay the $13 million purchase price.
(Compl. ¶ 30.)  Faggionato alleges that she then said to

Lerner "that this was good news because it would assist her in convincing the French owners to disclose their identities on the written provenance." (Compl. ¶ 30.) Faggionato claims that based on Lerner's agreement to purchase the Painting, and the terms of sale, she advised the owner's representative that the painting had been sold and she discontinued any further effort to sell the painting. (Compl. ¶ 31.)

On January 11, 2006, Marcus wrote to Faggionato that "Randy [Lerner] put many wheels in motion based on our initial suggestion of urgency" and also reported on his conversation with DeCampo "to reiterate" that they now needed more time "to get the documents reviewed and confirmed once they are all in hand." (Compl. ¶ 34.)  On January 13, 2006, Marcus e-mailed Faggionato a series of "concerns about a number of points of authenticity" that Lerner had raised, including asking for the owners' name to be placed on the Certificate of Authenticity (issued by Wildenstein), were there other interested parties, and whether Lerner could hire another expert to view the Painting. (Compl. ¶ 37, Baum Decl., Ex. Q.)  On January 14, 2006, Faggionato answered Lerner's questions, explaining that she had not encountered a false or revoked Certificate of Authority; that she would ask whether the owners' names

could be listed in the upcoming supplement to the catalogue raisonné; that Wildenstein had originally been contacted by the owners and that Wildenstein had tried to buy the painting in the past and might try again and that the Baltimore Museum had learned of the painting through Wildenstein. (Compl. ¶ 39, Baum Decl., Ex. R.)  Also, Faggionato explained that if Lerner were to proceed with a new expert viewing the Painting, it could "suggest to the sellers a wavering by Lerner with uncertain results." (Compl. ¶ 39, Baum Decl., Ex. R.)

On January 17, 2006, Marcus wrote to Faggionato that Lerner did not have the "comfort level" that he had requested to proceed with an immediate deposit and desired further proof. (Compl. ¶ 41, Baum Decl., Ex. T.)  On January 21, 2006, Marcus advised Faggionato that Lerner continued to love the painting but did not like buying it without "more transparency" and was seeking more documentation and clarity. (Compl. ¶ 43, Baum Decl., Ex. V.)

On February 2, 2006, Faggionato wrote to Marcus stating that the Painting "finally has a full set of documents," alleging that the conditions Lerner had requested in terms of documentation had been met. (Compl.

¶ 45, Baum Decl., Ex. X.)  Marcus replied that day to Faggionato commenting on the "terrific news" but also reminding Faggionato that there were documents that Lerner had still requested for full documentation of the Painting, including a written bill of sale. (See Compl. ¶ 46, Baum Decl., Ex. X at 2.)  On February 4, 2006, Marcus wrote an email to Faggionato expressing Lerner's concerns, stating that part of the difficulty was that "you represent the owner and know his identity, while my client and I do not" and reiterating that there was still a pending list of required information made by Lerner and his lawyer. (Baum Decl., Ex. Y at 1.)

On February 6, 2006, Marcus reported to Faggionato that Lerner had chosen not to purchase the Painting in part because "we were not forthcoming with his requests [for documents] and the lawyers needs." (Compl. ¶ 49, Baum. Decl., Ex. Z.)  On February 9, 2006, Faggionato sent the full provenance of the Painting to Marcus. (Compl. ¶ 51, Baum Decl., Ex. BB, Declaration of Benito Romano, Esq., dated May 16, 2006, ("Romano Decl."), Ex. Q.)[3]

---

[3] The version of the February 9, 2006, "Provenance email" that was submitted by Faggionato was redacted completely. However, an unredacted version (with translation) submitted by Lerner shows that the end of the provenance states only that the Painting was "acquired by division of family
(continued)

On February 10, 2006, Kendris Private caused an invoice for $13 million, the Painting's Passport, an Art Loss Register document, and the provenance of the Painting to be sent to DeCampo. (Compl. ¶ 51, Baum Decl., Ex. BB.) On February 13, 2006, DeCampo wrote to Kendris Private rejecting the sale documents and stating, "Mr. Lerner had abandoned any attempt to purchase this painting several weeks ago and we have had no communication regarding this transaction in over a month." (Compl. ¶ 52.)

Faggionato alleges that, "[o]n January 10, 2006, Lerner entered into a binding agreement with Faggionato, in Paris, France to purchase the [Painting], subject to receiving the customary documentation establishing [its] authenticity and provenance." (Compl. ¶ 5.) Faggionato asserts that this documentation was supplied to Lerner, but that on February 2, 2006, Lerner refused to consummate the purchase. (Compl. ¶ 5.) Faggionato now seeks specific performance, damages, and costs. (Compl. ¶¶ 56-59.)

In response to the present motion, Faggionato has withdrawn her first claim for specific performance and that

---

(continued)
estate in 2001" without revealing any more information about the family, such as a name. As discussed below, because Faggionato asserts that she disclosed the full provenance of the Painting to Lerner, it is integral to the case and may be considered on this motion.

11

part of her second claim seeking, on behalf of the owner,

any dimunition in the sale price to another buyer.

(Plaintiff's Memorandum of Law in Opposition to Defendant's

Motion to Dismiss, filed June 30, 2006, ("Pl. Opp. Memo"),

at pp. 2-3.)


DISCUSSION


Jurisdiction and Venue

This Court has subject matter jurisdiction over this

action under 28 U.S.C. § 1332, diversity jurisdiction, as

Faggionato is a citizen of a foreign country, and Lerner is

a United States citizen.  Venue is proper in that Lerner

resides in the Southern District of New York.


Legal Standard for Dismissal

"A case is properly dismissed for lack of subject

matter jurisdiction under Rule 12(b)(1) when the district

court lacks the statutory or constitutional power to

adjudicate it."  Makarova v. United States, 201 F.3d 110,

113 (2d Cir. 2000).  A plaintiff bears the burden of

proving by a preponderance of the evidence that subject

matter jurisdiction exists.  See McNutt v. General Motors

Acceptance Corp., 298 U.S. 178, 189 (1936); Luckett v.

Bure, 290 F.3d 493, 496 (2d Cir. 2002).  Jurisdictional

allegations must be shown affirmatively and may not be

inferred favorably to the party asserting them.  See In re

Nat. Australia Bank Secs. Litig., No. 03 Civ. 6537, 2006 WL

3844465, at *2 (S.D.N.Y. Oct. 25, 2006) (citing Shipping

Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir.

1998)).  In resolving the question of subject matter

jurisdiction, the district court may refer to evidence

outside the pleadings. Luckett v. Bure, 290 F.3d 493, 496-

497 (2d Cir. 2002)(citing Makarova v. United States, 201

F.3d 110, 113 (2d Cir. 2000)); see Flores v. Southern Peru

Copper Corp., 414 F.3d 233, 255 n.30 (2d Cir. 2003)(quoting

Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d

Cir. 1998)(Although courts are generally limited to

examining the sufficiency of the pleadings on a motion to

dismiss, "on a challeng[e] [to] the district court's

subject matter jurisdiction, the court may resolve disputed

jurisdictional fact issues by reference to evidence outside

the pleadings.").  Also, the parties in this case agree

that on a motion to dismiss, the Court may explore the

contents of the documents referred to in the Complaint.[4]
(See Baum Decl., ¶ 2.)

The Supreme Court in FW/PBS Inc. v. City of Dallas,
493 U.S. 215, 231 (1990) has noted that "[i]t is a long-
settled principle that standing cannot be inferred
argumentatively from the averments in the pleadings, but
rather must appear in the record." (citations and
quotations omitted). Cf. Brooklyn Legal Services Corp. v.
Legal Services Corp., 462 F.3d 219, 226 (2d Cir.
2006)(holding that "on a motion to dismiss for lack of
standing, we presume the general factual allegations
embrace those facts necessary to support the claim" and
"construe all reasonable inferences to be drawn from those
[jurisdictional] allegations in plaintiffs'
favor")(internal citations omitted)).  The Court of Appeals
has also noted that it will "take as true uncontroverted
factual allegations" and "construe jurisdictional
allegations liberally" but it will "not draw 'argumentative
inferences' in the plaintiff's favor". Robinson v. Overseas
Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).  On

---

[4] To the extent that the declarations of Leonard Baum, Esq.,
Faggionato's attorney, and Jerome LeBlay, an impressionist
and modern art expert from Paris, France go beyond the
allegations of the Complaint and the documents relied on in
the Complaint, they are not cognizable on this motion.

this motion, the Court will follow the teaching of <u>FW/PBS</u>
and <u>Robinson</u>.

<u>Choice of Law</u>

A federal court with diversity jurisdiction applies
the choice of law rules of the forum state. <u>Klaxon Co. v.
Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  New York
courts apply the law of the jurisdiction with the "most
significant relationship with the occurrence and with the
parties." <u>Babcock v. Jackson</u>, 191 N.E.2d 279, 284 (N.Y.
1963)(citing Restatement, Second, Conflict of Laws,
§ 379(1)).  With respect to a case alleging breach of
contract, New York applies a "center of gravity" or
"grouping of contacts" analysis which allows a court to
consider a spectrum of significant contacts. <u>Beth Israel
Medical Center v. Horizon Blue Cross and Blue Shield of New
Jersey, Inc.</u>, 448 F.3d 573, 583 (2d Cir. 2006)(internal
citations omitted).

In <u>In re Allstate Ins. Co.</u>, 613 N.E.2d 936 (N.Y.
1993)("<u>Stolarz</u>"), the New York Court of Appeals listed
several factors that a court should consider in a conflict
of law analysis in a contract case.  These factors include
"the place of contracting, negotiation, and performance;
the location of the subject matter of the contract; and the

domicile of the contracting parties." Id. at 940 (citing Restatement (Second) of Conflict of Laws, § 188(2)(1971)). The traditional choice of law factors, the places of contracting and performance, are given the heaviest weight in this analysis. Brink's Limited v. South African Airways, 93 F.3d 1022, 1031 (2d Cir. 1996)(citing Stolarz, 613 N.E.2d at 940).

Here, the most significant contacts and events occurred in France.  Lerner traveled to France in order to view the painting, which was located in France.  At least some of the negotiations took place in France, and many of the required documents were obtained in France from either French governmental authorities or French companies.  The only connection to New York is Lerner's United States citizenship and domicile.

In the choice of law analysis, New York courts also determine whether there is an actual conflict between the substantive laws of the jurisdictions involved. Stolarz, 613 N.E.2d at 937.  As described below, the Court accepts the opinions of the French law experts and, based on their analysis of what may be used under French law to prove a contract, concludes that there is a substantive difference between applicable New York law and French law.  For example, under French law, Article 1347 of the French Civil

Code allows testimonial proof of contract formation if the party can demonstrate that there has been a beginning of proof in writing, which serves as an exception to the formal writing generally required to prove a contract. (See infra)  New York law does not offer an explicitly equivalent exception to the Statute of Frauds for a contract for sale of goods worth $500 or more. See N.Y.U.C.C. § 2-201(1).

Federal Rule of Civil Procedure 44.1 provides that "[t]he court, in determining foreign law may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.  Rule 44.1 grants the district court wide latitude in resolving issues of foreign law, and the court's determination shall be treated as a ruling on a question of law. See Rutgerswerke AG & Frendo S.P.A. v. Abex Corp., No. 93-2914, 2002 WL 1203836 (S.D.N.Y. June 4, 2002).  The Court of Appeals has noted that "[f]requently, the proper determination of foreign law can be complicated task.  Rule 44.1 is intended to assist the court with its work and the court is, of course, free to enlist the parties in this effort.  Ultimately, the responsibility for correctly identifying and applying foreign law rests with the court." Rationis Enterprises

Inc. of Panama v. Hyundai Mipo Dockyard Co., 426 F.3d 580,
586 (2d Cir. 2005).  In acting under Rule 44.1, a court may
reject even uncontradicted expert testimony and reach its
own decisions on the basis of independent examination of
foreign legal authorities. Rutgerswerke AG, 2002 WL
1203836, at *16.  The Court of Appeals has urged district
courts to "invoke the flexible provisions of Rule 44.1" to
determine issues of foreign law. Curley v. AMR Corp., 153
F.3d 5, 13 (2d Cir. 1998).

French Law Analysis

     The Court's interpretation of French law, as set forth
below, is based on the expert law declarations submitted by
both parties.  In the areas where the two experts,
Professor Christian Larroumet and Professor Nicolas
Molsfessis, overlap, they do not appear to be in
disagreement, and those areas of law are accepted by the
Court. (See Declaration of Professor Larroumet, executed on
May 15, 2006, ("Larroumet Decl."), Declaration of Professor
Nicolas Molfessis, executed on June 29, 2006, ("Molfessis
Decl.").)  Ultimately, it appears that Professor
Larroumet's conclusions are more persuasive and
informative, and it is the "persuasive force of the
opinions" expressed that is conclusive under Rule 44.1.

_Itar-Tass Russian News Agency v. Russian Kurier, Inc._, 153
F.3d 82, 92 (2d Cir. 1998).  While the Court does accept
most of Professor Molfessis' exposition of French law, much
of the law he examines relating to a situation where
Faggionato supposedly intended and had contracted to
purchase the Painting from the owner or the owner's
intermediary in order to resell it to Lerner is not
applicable in the present action because Faggionato never
pled such a relationship in her Complaint and the
accompanying documents are inconsistent with such a
relationship.

        Professor Larroumet is a professor of civil and
commercial law at the University Panthéon-Assas (Paris) and
is also an attorney at law of the Paris Bar. (Larroumet
Decl.)  In addition, Professor Larroumet is the director
and partial author of a treatise on civil law and also has
written numerous articles in French and foreign law
reviews, many that specifically relate to the law of
contracts.  Thus, as demonstrated by his curriculum vitae,
Professor Larroumet is eminently qualified to opine on the
issues presented.

        Professor Molfessis is a professor of, among other
things, civil law and the law of obligations (contracts) at
the University Panthéon-Assas (Paris).  Professor Molfessis

is also the member of various legal boards and committees on French law, and has published numerous books, articles, and notes including some on contract law.  Thus, as demonstrated by his curriculum vitae, Professor Molfessis is eminently qualified to opine on the issues presented.

Professor Larroumet notes from the outset that under French law, "the most important requirement to admit the existence of a contract is the meeting of the minds." (Larroumet Decl. at ¶ 26.)  Professor Molfessis does not address such a requirement, but such a requirement is a widely recognized element of contract formation and the Court accepts Professor Larroumet's assessment that a meeting of the minds is necessary for a contract to be valid under French law.

Professor Larroumet proceeds to examine various relationships that might have existed between the parties involved in the action and then examines whether the facts disclosed in the Complaint and documents referred to therein would support the finding of any such relationships under French law.  The first characterization of the relationships is a contract of agency (mandat), where an intermediary, the agent, enters into a legal transaction on behalf of and in the name of another person, the principal. (Larroumet Decl. at ¶ 14.)  Such a legal transaction

concluded by an agent would be deemed as entered into by the principal but the agent must be in a position to "justify that it has been duly and specifically entrusted with filing such an action in the name and on behalf of the principal." (Larroumet Decl. at ¶¶ 14-15.)  However, to be duly characterized as an agent, to have such authority to enter into legal transactions for the principal, one has to justify having received powers to act in such a capacity. (Larroumet Decl. at ¶ 15.)  Professor Larroumet concludes that this relationship did not exist here for two reasons: (1) because Faggionato has not proved, and has not even claimed, that she had been granted powers to conclude the sale of the painting with defendant in the name and on behalf of the owner of said painting; and (2) because it is necessary that the identities of both the agent and the principal and their respective capacities be known by the third party, and in this case, the name of the owner was not disclosed to Lerner at the time when the contract was allegedly entered into. (Larroumet Decl. at ¶¶ 15-16.) Professor Molfessis does not appear to dispute this analysis of the requirements for an agent/principal relationship, and thus the Court accepts this analysis by Professor Larroumet on the lack of a proper agent/principal relationship (mandat) in this action.

Professor Larroumet then examined the possibility that
the contract was concluded pursuant to a déclaration de
command, which is where one person (the "command") asks
another person (the "commandé") to enter into a contract on
behalf of the former. (Larroumet Decl. at ¶ 17.)  The
commandé must tell the other party to the contract that he
is not concluding the contract for himself, but at the
outset, the commandé does not disclose the identity of the
command. (Larroumet Decl. at ¶ 17.)  "It is only after the
sale is entered into that the name of the command must be
disclosed and the disclosure has to be made very quickly
after the sale has been concluded." (Larroumet Decl. at
¶ 17.)  Professor Larroumet goes on to explain that this
relationship could not have existed in the present action
because this type of transaction is used to hide the
identity of the <u>buyer</u> only, not that of a seller.
(Larroumet Decl. at ¶ 18.)  In addition, Professor
Larroumet notes, if a contract has been concluded by a
legitimate commandé, this does not allow the commandé to
sue the other party for specific performance. (Larroumet
Decl. at ¶ 18.)  Professor Molfessis does not appear to
dispute this legal analysis, and, pursuant to Rule 44.1,
the Court accepts Professor Larroumet's analysis of this
legal relationship.

Professor Larroumet next examines the possibility of a convention de prête-nom, which is also referred to as an interposition de personne.  In this circumstance, a straw man agrees to act in a legal transaction in his own name on behalf and in the interest of another person "because that one does not want to disclose his identity." (Larroumet Decl. at ¶ 19.)  The convention de prête-nom is valid under French law provided that it is not used to pursue fraudulent aims. (Larroumet Decl. at ¶ 20.)  "The legal effect of the convention de prête-nom is that, since the party who has concluded the contract with the prête-nom has acted on behalf of another person and does not know the name of the principal, the prête-nom, in his relationship with the contracting party, must be considered as concluding the contract for himself." (Larroumet Decl. at ¶ 20.)  That means that, if the party who entered into the contract with the prête-nom does not perform, the prête-nom may claim in his own name against that party, and the hidden principal could sue the contracting party only if the prête-nom assigns the rights and obligations arising under the contract to the principal. (Larroumet Decl. at ¶ 20.)

Professor Larroumet explains that there are three reasons why this relationship could not have existed in

this action.  First, "it has never been made clear who
would play the role of the intermediary between defendant
and the owner of the painting." (Larroumet Decl. at ¶ 22.)
While Faggionato seems to claim that she was the one who
had been "entrusted with this task," Professor Larroumet
notes that it is indicated on draft bill of sale forwarded
to Lerner in February 2006, that "Kendris is the
intermediary which would enter into the contract in its own
name." (Larroumet Decl. at ¶ 22.)  Thus, it is not clear
that the proper party playing the role of prête-nom could
have been identified.  The second reason Professor
Larroumet identifies why this relationship could not have
existed is that Faggionato admits that "at the time the
oral agreement was allegedly entered into, i.e., January
10, 2006, she did not know herself the name of the actual
owner of the painting." (Larroumet Decl. at ¶ 23.)
Professor Larroumet concludes that it is not possible to
claim that Faggionato was duly empowered to act as a
strawman on behalf of the owners of the Painting, whose
identity she did not know. (Larroumet Decl. at ¶ 23.)  The
third reason Professor Larroumet states that the convention
de prête-nom could not have existed is because one cannot
consider the effects of the existence of a convention de
prête-nom before the contract for which one party wishes to

hide its identity is entered into; thus one "cannot have the capacity of prête-nom if no contract has been entered into." (Larroumet Decl. at ¶ 24.)  Professor Larroumet also examines whether a contract had been properly entered into in this action.  Professor Molfessis does not examine the convention de prête-nom, and, for that reason and because it is persuasive, Professor Larroumet's examination of this relationship is accepted.  However, Professor Molfessis does examine the question of whether there was a contract entered into, and thus the Court examines the analysis of both experts and their respective conclusions.

Both experts agree that any contract involving an amount greater than 1500 euros can be proved formally only through a writing that records the terms of the contract. (Larroumet Decl. at ¶ 27, Molfessis Decl. at ¶ 16.) However if there is no such document, under Article 1347 of the French Civil Code, there is an exception to the writing requirement if there exists a "beginning of proof in writing." (Molfessis Decl. at ¶ 16)(See Larroumet Decl. at ¶ 27.)  Under this exception, a written document issued by the person against whom the claim is made or by a representative agent of that person, may be used to prove the beginning of proof in writing. (Larroumet Decl. at ¶ 28, Molfessis Decl. at ¶¶ 16, 19.)  Professor Molfessis

states that the burden of proof of the beginning of proof
in writing falls upon the person who is seeking to show the
existence of such beginning. (Molfessis Decl. at ¶ 20.)

Professor Molfessis concludes that there are three
conditions that must be met in order to prove the beginning
of a writing.  First, there must be something written, and
electronic writings are evaluated in the same manner as
paper documents. (Molfessis Decl. at ¶ 18.)  Second, the
writings must be issued by the person against whom they are
enforceable or by his representative. (Molfessis Decl. at ¶
19.)  Third, the beginning of proof in writing is not
requird to prove the alleged act, but only must make it
more likely, "the result of this likelihood being that it
authorizes the plaintiff to then show the corresponding
proof by any means." (Molfessis Decl. at ¶ 21.)  Professor
Larroumet does not address directly these three
considerations but he does examine the necessity that the
document be from a duly authorized agent of the person
against whom the document is enforceable. (Larroumet Decl.
at ¶ 28.)  Thus, the main area of disagreement between the
French law experts appears to be whether various emails
from parties other than Lerner suffice as the beginning of
proof in writing because those people qualified as duly
authorized agents for Lerner.  The Court accepts the

26

analysis of the requirements for a contract and the
exceptions to the writing requirement under French law.

Professor Molfessis devotes a great deal of his
declaration to explaining another relationship, which is
raised for the first time in his declaration and in
Faggionato's opposition papers, submitted, of course, after
the Complaint and in response to Lerner's motion to
dismiss.  Professor Molfessis asserts that Faggionato
intended to buy the Painting from the owner's
intermediaries in order to resell the Painting to Lerner.
(Molfessis Decl. at ¶¶ 9-10.)[5]  Professor Molfessis states
that "we must infer that Mrs. Faggionato was prepared to
purchase the work from Natural Lecoultre, a representative
of the original owner, the latter having purchased it from
the actual owner.  It was therefore a resale, which is to
say a new sale, which was to take place to Mr. Lerner's
benefit for $13 million." (Molfessis Decl. at ¶ 10.)
Professor Molfessis concedes that the Painting was not
Faggionato's property at the time of the agreement but
asserts that Faggionato "at the time of the sale of the

---

[5] To the extent that Professor Molfessis' declaration
includes facts beyond those alleged in the Complaint and
the documents relied on in the Complaint, they are not
cognizable on this motion.  Such facts are included in this
section only for the purpose of discussing Professor
Molfessis' opinion.

Painting to Mr. Lerner, had made arrangements to purchase the painting from Natural Lecoultre, which was acting for the owner." (Molfessis Decl. at ¶ 13.)  Thus, Professor Molfessis claims that on the day of the alleged sale of the painting to Lerner, Faggionato "presented herself as the holder of a conditional right to the painting . . . despite not being the owner." (Molfessis Decl. at ¶ 13.)  Professor Molfessis concludes that this position is an acceptable way to contract a sale, provided that Faggionato is "able to demonstrate the existence of a sale with Mr. Lerner, i.e., the existence of an agreement on the object and on the price." (Molfessis Decl. at ¶ 15.)  The Court accepts, under Rule 44.1, Professor Molfessis' recitation of French law to the effect that a plaintiff may prosecute a breach of contract claim for sale of property which he does not own where he has the legal right to acquire the property.  This new theory, however, was not pled in the Complaint, and, of course, the Court need not accept assertions contained in briefs.  Also, upon examination of the documents referred to in the Complaint, it does not appear that such a relationship existed – with Faggionato as the owner of the Painting or having a conditional right to the Painting and then selling it to Lerner.

Faggionato Lacks Standing

In order to assert a claim in federal court, a plaintiff must be able to demonstrate that she has standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); see also Alliance For Envtl. Renewal Inc., v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.2 (2d Cir. 2006). The standing inquiry focuses on whether the plaintiff is a proper party to bring a claim and, as a result, "often turns on the nature and source of the claim asserted." Raines v. Byrd, 521 U.S. 811, 818 (1997).  Where the claim asserted is contractual and the plaintiff is not a party to the contract or a third party beneficiary of the contract, the claim must be dismissed. See e.g., Hylte Bruks Aktiebolag v. Babcock & Wilcox Co., 399 F.2d 289, 292 (2d Cir. 1968)(affirming dismissal for lack of standing because plaintiff was neither a party to the contract or third party beneficiary); Israel v. Carpenter, No. 95 Civ. 2793, 1996 WL 257643, at *6 (S.D.N.Y. May 15, 1996)(plaintiff lacked standing to assert a claim related to a contract that was not between the parties).

In a diversity action, a plaintiff must meet both the Article III standing requirements and the standing requirements of applicable state law. Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d

168, 173 (2d Cir. 2005).  Here, however, the Court has
determined that French law, not New York law, applies to
the action.

Under French law, as described above by Professor
Larroumet and accepted by the Court, Faggionato was not a
proper party to the contract and thus cannot seek relief on
her claims.  The Court accepts Professor Larroumet's
conclusions as persuasive.

Professor Larroumet pointed out that Faggionato was
not a proper agent under the theory of mandat because
Faggionato did not show that she had been granted powers to
conduct the sale for the owners and because the identity of
the owner (principal) was not revealed to the third-party
(Lerner).  Also, Professor Larroumet explained that a
declaration de command was not applicable in this
transaction because that type of transaction is used to
hide the identity of the buyer only, not the seller.
Professor Larroumet concluded that Faggionato could not
rightfully be labeled a prête-nom in a convention de prête-
nom because it was not clear who would play the role of
intermediary between Lerner and the actual owners,
Faggionato did not know the name of the actual owner at
time the oral agreement was allegedly entered into, and one
cannot have the capacity of a prête-nom if a contract had

not been entered into.  Professor Larroumet examined the
requirements for a contract under French law and determined
that no valid contract ever existed and that there was not
sufficient beginning of proof in writing to permit
Faggionato to give more evidence through testimony.  Since
Faggionato did not fill any of the roles necessary to be a
proper party to the contract, including not being the owner
of the Painting at the time of the alleged contract
negotiations or properly representing the owners, she lacks
standing under French law.


Facts Do Not Support Faggionato's New Claim of Ownership

     In her opposition papers on this motion, Faggionato
asserts a new claim that she had a conditional right to own
the Painting because she was acting as a "middleman" in a
back-to-back sales transaction that would enable her to
resell the painting to Lerner. (See, Pl. Opp. Memo at p.10;
Molfessis Decl.)  However, Faggionato failed to assert such
a relationship and related transaction in her Complaint.

     Although the Federal Rules of Civil Procedure employ a
liberal pleading standard, the pleadings are required to
put a defendant on notice of the basis of a plaintiff's
claims and must state more than mere legal conclusions. See
Fed. R. Civ. P. 8; Cooper v. Parsky, 140 F.3d 433, 440 (2d

Cir. 1998).  In this case, Faggionato failed to allege in her Complaint that the back-to-back sale transaction theory is the basis for her lost profit claim, and therefore the Complaint fails to put Lerner on proper notice.  There is no allegation that Faggionato had entered into an agreement to purchase the Painting from the owner to re-sell it to Lerner for a profit; there is no reference to a back-to-back transaction; there is no mention of an agreement between Faggionato, the owner, Natural Lecoultre, Galerie Du XXee Siecle, Jerome LeBlay, or any of the other entities Faggionato now claims were part of the alleged transaction. Accordingly, this claim may not be considered by the Court, both because it is only contained in briefs and because it violates the notice pleading requirement.

While in many cases, repleading might be permitted, the documents integral to the alleged transaction here demonstrate that repleading to articulate a claim consistent with Professor Molfessis' legal theory that Faggionato was to be the seller to Lerner and that she had the legal right to acquire the Painting from the owner would be futile.  Faggionato's new allegation that she is the seller/owner is flatly contradicted by the documents that reflect the interaction between the parties. See e.g., Quatrochu v. Citibank, N.A., 210 A.D.2d 53 (N.Y. App. Div.

1994)(New York appellate court affirmed the dismissal of an action to recover lost profits from the aborted sale of a Renoir painting because the allegations in the complaint were "flatly contradicted" by the invoice and bill of sale attached to the complaint, which clearly established that the plaintiff was not the party to the transaction).

Every document that Faggionato claims reflects the purported sale -- the deposit letters, the bill of sale, the draft contract, and the invoice -- all name Kendris or Ibima as the seller (Baum Decl. Exs. E, BB.)  The Complaint and the documents fail to mention any specific relationship between Kendris and Faggionato; instead Faggionato explains that Kendris is a prominent wealth management firm in Europe and a manager of Nouvelle Société Anonyme des Arts ("Nouvelle"), the company with which Faggionato was working in implementing the sale. (Compl. ¶ 18.)  In various emails, Faggionato refers to the "owners" or the "sellers," and it is evident that she is not referring to herself. Thus, Faggionato still lacks standing as she has no standing to sue on the rights of others, and the purported agreement is in the name of a party to whom she alleges no relationship in the Complaint.  Similarly, in her January 14, 2006 email, Faggionato notes that "if the sellers detect the slightest wavering from Randy [Lerner] at this

point there is no way of knowing what these paranoic [sic] lunatics will do." (Baum Decl., Ex. R at 8.)  All of these documents are inconsistent with Faggionato's new position that she had a conditional right to acquire the Painting. (See Compl. ¶ 39, Baum Decl., Ex. R, a January 14, 2006 email in which Faggionato answers Lerner's questions and notes that other parties have expressed interest in buying the Painting and that if Lerner tried to have another expert examine the painting, that might suggest to the sellers a wavering by Lerner.)

In a reply email to questions by Marcus on January 7, 2006, Faggionato noted that Lerner would not receive a bill of sale from the owners but from one of the other parties, either Faggionato's gallery, Kendris, or Nouvelle but at that point Faggionato continues to acknowledge that there is an undisclosed owner – obviously not herself – whose identity would be revealed "in due course." (Baum Decl., Ex. H.)  In an email from Faggionato to Ms. Esther Notz, who was apparently the contact at Kendris, Faggionato mentions how the owners will use the deposit to pay the tax needed to export the Painting, and again it is clear that she is not referring to herself. (Baum Decl., Ex. S.)  In fact, nowhere in the numerous emails sent by Faggionato to other people involved in the supposed transaction does

34

Faggionato ever refer to the fact necessary for her new
theory that she has a conditional right of ownership of the
Painting or that she has conducted or will conduct a back-
to-back transaction to make her the seller.  If she had,
then she would not be so worried about keeping the "owners"
calm.  Similarly, throughout the relevant time period,
Lerner continued to seek the identity of the owners as
evidenced by emails from Marcus to Faggionato and from
Lerner's lawyer to Marcus. (See Baum Decl., Exs. I, L, R,
T.)  Thus, Faggionato's new theory is inconsistent with the
documents proffered, and repleading to state that theory
would be futile.


<u>CONCLUSION</u>


    Based on the Complaint as well as an examination of
the documents relied on by Faggionato in her Complaint,
with the aid of the declarations of the French law experts,
the Court finds that Faggionato lacks standing to sue.[6]

---

[6] As the Court determines the issue of standing to be
dispositive, it will not reach the other arguments
presented by Lerner. Lerner also argues (1) that the facts
alleged cannot be interpreted to support the formation of a
contract because (a) the alleged conduct evidences no
intent to be bound and there was no meeting of the minds
and (b) there is no binding agreement because the parties
                                            (continued)

The Court rejects Faggionato's recently discovered theory of a back-to-back transaction because (1) Faggionato failed to allege properly such a relationship in her Complaint, and (2) the documents relied on by Faggionato in her Complaint are inconsistent with such a relationship. Thus, repleading would be futile. Accordingly, Lerner's motion to dismiss [dkt. no. 5] is granted.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED:

Dated:   New York, New York
         March 30, 2007

LORETTA A. PRESKA, U.S.D.J.

---

(continued)
intended to be bound only by a written contract; (2) the alleged agreement is unenforceable under the Statute of Frauds; (3) Faggionato fails to assert a claim for lost commissions; (4) New York does not recognize a claim for damage to reputation.